## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **KENNETH D. MURENA**, in his capacity as court-appointed Receiver of Drive Planning, LLC, | : : : : | |
| Plaintiff, | : : | |
| v. | : : | Civil Action No._____ |
| **CQ CONSULTING SERVICES, LLC, CHRISTINA QUINTANA, RYAN A. LOGAN, RAL FINANCIAL INC., TRACEY FERGUSON, TNT LEGACY, LLC, MONICA PEREZ, BLUE SERVICES, LLC, MEREDITH BRUCE, SDWC FINANCIAL, LLC, EVOLUTION FINANCIAL & INSURANCE SOLUTION, SUSAN DUKE, RYAN F. LAWLOR, INTEGRATED WEALTH STRATEGIES, KETLER BOSSE, ROBIN L. ROWAN AND SAFE LIFE SOLUTIONS, LLC, FRANCISCO HERRERA, CONFIA FINANCIAL GROUP, TERRY HOLMAN, JAMES BEATTEY, VELOMON, LLC, JOHN WILLIAMSON, AIMEE SPENCER, JULIANA MEJIA, FNJ SERVICES, LLC,** | : : : : : : : : : | |

**WILLIAM N. HOLT,**
**SUMMERFIELDS BRANDS, LLC,**
**EVERETT J. STULL,**
**ADAM ISRAEL,**
**TARA METTLER, POSITION**
**YOURSELF WEALTH**
**STRATEGIES,**
**AUDICOL SERVICES, LLC,**
**RAMON DONATO PALACIO,**
**ANGELA RUFF,**
**JEFFREY LAWRENCE BLACK JR.,**
**DOUGLAS EZE, LARGO**
**FINANCIAL SERVICES LLC,**
**REMY CRUZMEL, BLUEGENIE**
**SOLUTIONS, LLC,**
**RICARDO AGUIRRE,**
**BANAMERICA FINANCIAL**
**GROUP,**
**WOODFORD CONSULTING, LLC,**
**and**
**MICHAEL WOODFORD,**

    Defendants.

_____

## ANCILLARY COMPLAINT

Kenneth D. Murena, as Court-Appointed Receiver (the "Receiver") of Drive

Planning, LLC, acting pursuant to this Court's Order Appointing Receiver entered

in the above-captioned enforcement action and pursuant to Fed. R. Civ. P. 66 and 28

U.S.C. § 959, sues the individuals and entities listed in the caption (collectively

"Defendants" or "Agents"), for actual and constructive fraudulent transfers under

GUVTA,[1] and unjust enrichment under Georgia common law, to avoid, recover, and disgorge, the more than $27,500,000 these Defendants collectively received in the form of improper and illegal commissions paid to them for soliciting and securing "investors" (mostly victims) in the Drive Planning Ponzi[2] scheme that is at the heart of this U.S. Securities and Exchange Commission ("SEC") enforcement action,[3] and states as follows:

## I.    OVERVIEW

1.    SEC Enforcement Action Defendant Russell Todd Burkhalter, from 2020 to 2024, through his wholly owned and controlled Receivership Entity, Drive Planning, LLC ("Drive Planning"), ran a massive Ponzi scheme raising approximately $380,000,000 from approximately 2,400 "investors," returning approximately $160,000,000 in "false profits" to "investors" using other "investors'" money, and inflicting what is believed to be at least $220,000,000 in

---

[1] The Receiver refers to the Georgia Uniform Voidable Transactions Act, O.C.G.A. §§ 18-2-70, *et seq.*, as "GUVTA".

[2] "The term 'Ponzi' derives from Charles Ponzi, a ground-breaking swindler who, in eight months in the early 1900's took in over $9 million by selling notes for $100 with the promise to pay $150 for each note in 90 days." *See SEC v. Better Life Club of Am., Inc.*, 995 F. Supp. 167, n.1 (D.D.C. 1998) (*quoting Cunningham v. Brown*, 265 U.S. 1 (1923)).

[3] The SEC commenced the related enforcement action against Defendant Burkhalter and Drive Planning on August 13, 2024 commencing the case captioned *SEC v. Drive Planning, LLC*, Case No. 1:24-cv-03583-VWC ("SEC Enforcement Action").

"investor" "net losses." The scale of this Ponzi scheme is staggering, and the "investor" losses are tragic.

2.    Fortunately, the SEC intervened, filed the SEC Enforcement Action, obtained the Receiver's appointment, and put an end to the Drive Planning Ponzi scheme before it could cause further harm.

3.    The Court presiding over the SEC Enforcement Action tasked the Receiver with administering Drive Planning's assets, which include its litigation claims to recover "investor" funds improperly and illegally paid to insiders, affiliates, and third parties. The Receiver does just that in this ancillary action. He sues Defendants as they are individuals and entities that/who received "investor" money ("Commissions") from Drive Planning for helping SEC Enforcement Action Defendant Burkhalter and his accomplices promote, continue, expand, and further Burkhalter's illicit Drive Planning Ponzi scheme by convincing new "investors" to trust Drive Planning with their money.

4.    The Commissions the Agents received from Drive Planning came from "investor" funds, which also constitute the proceeds from the sale of unregistered securities under applicable federal securities laws making the Commissions ill-gotten gains and subject to avoidance, recovery, and disgorgement under applicable Georgia law that voids contracts for immoral or illegal endeavors and transfers made

with fraudulent intent, by an insolvent enterprise, for receipt of no value in return. *See* 15 U.S.C. § 78cc; O.C.G.A. § 13-8-1; O.C.G.A. §§ 18-2-70, *et seq.*

5.     While Burkhalter founded Drive Planning he did not act alone. He by himself could not have perpetrated such a pervasive transnational and international Ponzi scheme.

6.     A Ponzi scheme of this scale relied on numerous agents (including Defendants) to promote and expand its reach by convincing numerous investors to "invest" their retirement accounts and to take hard-money loans secured by hard-earned equity in their homesteads and use the loan proceeds to "invest" in Drive Planning and reap the alleged 40% "returns" promised to "investors".

7.     A prime example is David Bradford, who took to as many media outlets as he could to spread the Drive Planning Ponzi scheme, often persuading the public that he and Drive Planning were trustworthy to keep the "investor" funds flowing in and the Ponzi scheme afloat.[4]

8.     Being Burkhalter's right hand man and one of the principal propagators of the Drive Planning Ponzi scheme brought along many perks like over $20 million in improper and illegal commission payments he received from the funds of other

---

[4] He appears here on LinkedIn in a posted entitled "Why You Should Trust Us": https://www.linkedin.com/posts/driveplanning_exploring-the-real-opportunity-ever-activity-7110608010447605760-3NBQ

"investors" in the Drive Planning Ponzi scheme. Upon the Receiver's demand and pursuant to the Receiver's claims to recover the Commissions from him, Bradford has to date turned over millions of dollars' worth of assets to the Receivership Estate and continues to cooperate with the Receiver.  As such, he has not been sued in this ancillary action, though the Receiver has reserved his rights to seek the recovery of additional assets through litigation as necessary and appropriate.

9.     Other agents also went to great lengths to promote the Drive Planning scheme, including Gerardo Linarducci, who received over $5.8 million in Commissions for luring in "investors" – making him the second most handsomely compensated Drive Planning agent..[5]

10.     The third highest paid Drive Planning agent, Christina Quintana, a social media influencer, who purports to provide financial advice, ensnared her family, friends, and followers in the Drive Planning Ponzi scheme and in return for her deeds received approximately $4.3 million in illegal and improper Commissions directly and through her alter-ego Defendant CQ Consulting Services, LLC.

---

[5] The Receiver would have sued Gerardo Linarducci in this ancillary action to seek to avoid, recover, and disgorge such Commissions, but he is currently a voluntary debtor in bankruptcy and protected by the U.S. Bankruptcy Code's automatic stay.

11.    The only comment on Bradford's post on Drive Planning's LinkedIn page was from Quintana, expressing her approval of Bradford's post promoting the Driving Planning Ponzi scheme.[6]

12.    Bradford, Linarducci, and Quintana are among the over 160 Agents for Drive Planning who/that took part in soliciting and securing "investors" in the Ponzi scheme and who/that were rewarded for their role in the scheme through receipt of illegal and improper Commission payments Drive Planning paid to them, which were derived from the funds of other "investors."

13.    The Receiver sues Quintana, her alter-ego CQ Consulting Services, LLC, and 44 other Agents in this ancillary action to avoid and recover under GUVTA, and disgorge under Georgia common law unjust enrichment, the more than $27,500,000 in improper and illegal Commissions they received from Drive Planning from 2020 to 2024.

14.    This ancillary action furthers the Receiver's duties to seek to investigate and pursue claims to recover assets of Drive Planning to return to its investors who

---

[6] *See*
https://www.linkedin.com/feed/update/urn:li:ugcPost:7110608009755512832?commentUrn=urn%3Ali%3Acomment%3A%28ugcPost%3A7110608009755512832%2C7112587059474661379%29&dashCommentUrn=urn%3Ali%3Afsd_comment%3A%287112587059474661379%2Curn%3Ali%3AugcPost%3A7110608009755512832%29

lost approximately $220 million dollars at the hands of, among others, Quintana and the other Agents the Receiver sues in this ancillary action.

## II.    PARTIES

15.    Plaintiff, Kenneth D. Murena, is acting solely in his capacity as a federal-court-appointed receiver pursuant to the authority granted to him by this Court in the Order Appointing Receiver (the "Receivership Order") entered in the SEC Enforcement Action, and pursuant to Fed. R. Civ. P. 66 and 28 U.S.C. § 959. *See* Case No. 1:24-cv-03583-VMC [ECF No. 10].

16.    Defendant, CQ Consulting Services, LLC, is a limited liability company in the State of Georgia and may be served with process in St. Johns County, Florida, which is within the Middle District of Florida, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

17.    Defendant, Christina Quintana, is a citizen of the Florida and may be served with process in St. Johns County, Florida, which is within the Middle District of Florida, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

18.    Defendant, RAL Financial Inc., is a company in the State of California and may be served with process in Orange County, which is within the Central District of California, a district within which the Receiver filed a Notice of

Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

19.    Defendant, Ryan Logan, is a citizen of the State of California and may be served with process in Orange County, which is within the Central District of California, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

20.    Defendant, TNT Legacy LLC, is a limited liability company in the State of Georgia and may be served with process in Lumpkin County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

21.    Defendant, Tracey Ferguson, is a citizen of the State of Geogia and may be served with process in Lumpkin County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

22.    Defendant, Blue Services LLC, is a limited liability company in the State of Georgia and may be served with process in Gwinnet County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

23.    Defendant, Monica Perez, is a citizen of the State of Georgia and may be served with process in Gwinnett County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

9

24.     Defendant, SDWC Financial, LLC is a limited liability company in the State of Georgia and may be served with process in Cobb County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

25.     Defendant, Meredith Bruce, is a citizen of the State of Georgia and may be served with process in Cobb County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

26.     Defendant, Evolution Financial & Insurance Solutions, LLC, is a limited liability company in the State of California and may be served with process in Los Angeles County, which is within the Central District of California, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

27.     Defendant, Susan Duke, is a citizen of the State of Georgia and may be served with process in Forsyth County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

28.     Defendant, Ryan F. Lawlor, is a citizen of the State of Florida and may be served with process in Palm Beach County, which is within the Southern District of Florida, a district within which the Receiver filed a Notice of Receivership pursuant to 28 U.S.C. § 754.

29.     Defendant, Integrated Wealth Strategies, is a limited liability company in the State of New Jersey and may be served with process in Camden County, which is within the District of New Jersey, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

30.     Defendant, Ketler Bosse, is a citizen of the State of New Hampshire and may be served with process in Hillsborough County, which is within the District of New Hampshire, a district within which the Receiver filed a Notice of Receivership pursuant to 28 U.S.C. § 754.

31.     Defendant, Safe Life Solutions, LLC, is a limited liability company in the State of Alabama and may be served with process in Baldwin County, which is within the Southern District of Alabama, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

32.     Defendant, Confia Financial Corp., is a corporation in the State of Illinois and may be served with process in Cook County, which is within the Northern District of Illinois, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

33.     Defendant, Terry Holman, is a citizen of the State of Georgia and may be served with process in Gwinnett County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

34.     Defendant, Velomon LLC, is a limited liability company in the State of Indiana and may be served with process in Hamilton County, which is within the Southern District of Indiana, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

35.     Defendant, James L. Beattey, is a citizen of the State of Indiana and may be served with process in Hamilton County, which is within the Southern District of Indiana, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

36.     Defendant, John Williamson, is a citizen of the State of Tennessee and may be served with process in Davidson County, which is within the Middle District of Tennessee, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

37.     Defendant, Aimee Spencer, is a citizen of the State of Virginia and may be served with process in Fairfax County, which is within the Eastern District of

Virginia, a district within which the Receiver filed a Notice of Receivership pursuant to 28 U.S.C. § 754.

38.    Defendant, FNJ Services, LLC, is a limited liability company in the State of Georgia and may be served with process in Gwinnett County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

39.    Defendant, Juliana Mejia, is a citizen of the State of Georgia and may be served with process in Gwinnett County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

40.    Defendant, Summerfield Brands, LLC, is a limited liability company in the State of North Carolina and may be served with process in Guilford County, which is within the Middle District of North Carolina, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

41.    Defendant, William N. Holt, is a citizen of the State of North Carolina and may be served with process in Guilford County, which is within the Middle District of North Carolina, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

42.    Defendant, Everett J. Stull, is a citizen of the State of Georgia and may be served with process in DeKalb County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

43.    Defendant, Adam Israel, is a citizen of the State of Indiana and may be served with process in Franklin County, which is within the Southern District of Indiana, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

44.    Defendant, Position Yourself Wealth Strategies, LLC, is a limited liability company in the State of Georgia and may be served with process in Paulding County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

45.    Defendant, Tara Mettler, is a citizen of the State of Georgia and may be served with process in Paulding County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

46.    Defendant, Audicol Services LLC, is a limited liability company in the State of Georgia and may be served with process in Fulton County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

47.    Defendant, Ramon Donato Palacio, is a citizen of the State of Georgia and may be served with process in Fulton County, which is within the Northern

14

District of Georgia, the district within which the SEC Enforcement Action is pending.

48.    Defendant, Angela Ruff, is a citizen of the State of Georgia and may be served with process in Hall County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

49.    Defendant, Jeffrey Lawrence Black, Jr. is a citizen of the State of Texas and may be served with process in Harris County, which is within the Southern District of Texas, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

50.    Defendant, Largo Financial Services LLC, is a limited liability company in the State of Maryland and may be served with process in Prince Georges County, which is within the District of Maryland, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

51.    Defendant, Douglas Eze, is a citizen of the State of Maryland and may be served with process in Prince Georges County, which is within the District of Maryland, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

52.    Defendant, Bluegenie Solutions, LLC, is a limited liability company in the State of Texas and may be served with process in Denton County, which is within

the Eastern District of Texas, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

53.    Defendant, Remy Cruzmel, is a citizen of the State of Texas and may be served with process in Denton County, which is within the Eastern District of Texas, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

54.    Defendant, Banamerica Financial Group, Inc. is a corporation in the State of Illinois and may be served with process in DuPage County, which is within the Northern District of Illinois, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

55.    Defendant, Ricardo Aguirre, is a citizen of the State of Illinois and may be served with process in DuPage County, which is within the Northern District of Illinois, a district within which the Receiver filed a Notice of Receivership within ten (10) days of appointment or reappointment pursuant to 28 U.S.C. § 754.

56.    Defendant, Woodford Consulting, LLC, is a limited liability company in the State of Georgia and may be served with process in Fulton County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

16

57.    Defendant, Michael Woodford, is a citizen of the State of Georgia and may be served with process in Fulton County, which is within the Northern District of Georgia, the district within which the SEC Enforcement Action is pending.

## III.    JURISDICTION

### A.    Subject Matter Jurisdiction

58.    This Court has subject matter jurisdiction over this ancillary action by virtue of the Receivership Order, and this action is incidental to the preservation, collection, and distribution of assets of the Receivership Estate. The Receiver brings this ancillary action against Defendants in furtherance of his duties under the Receivership Order.

59.    "Courts have long recognized a federal court's supplemental jurisdiction over actions related to a receivership established in federal court."[7] This Court has subject-matter jurisdiction over the state-law claims asserted in this complaint in this ancillary action pursuant to 28 U.S.C. §§ 754, 1367 because those claims are ancillary to the SEC Enforcement Action, *SEC v. Drive Planning, LLC*, Civ. Action No. 24-cv-03582-VMC (N.D. Ga.), over which the Court in this district has jurisdiction pursuant to 28 U.S.C. § 1331.[8]

---

[7] *Mandel v. Howard*, No. 11-23620-Civ-COOKE, 2012 U.S. Dist. LEXIS 43948, at *7 (S.D. Fla. Mar. 28, 2012) (collecting cases).

[8] *Damian v. Massaro*, No. 10-23987-CIV-MORENO, 2011 U.S. Dist. LEXIS 93371, at *4 (S.D. Fla. Aug. 22, 2011) (denying motion to dismiss for lack of subject matter

60.    This action is properly before this Court under the Court's ancillary jurisdiction because the Receiver brings this action to exercise his obligations under the Receivership Order.[9]

61.    The SEC Enforcement Action is within the jurisdiction of the federal court in this district under 28 U.S.C. § 1331 and this ancillary action is in furtherance of the Receiver's duties under the Receivership Order entered in the SEC Enforcement Action.[10]

---

jurisdiction and stating "This is an ancillary action to the SEC case, over which the Middle District of Pennsylvania had original jurisdiction. Pursuant to 28 U.S.C. § 754 and 28 U.S.C. § 1367(a), this Court has subject matter jurisdiction" and citing to *Haile v. Henderson Nat'l Bank,* 657 F.2d 816, 822 (6th Cir. 1981)); *Perlman v. Five Corners Inv'rs I, LLC,* No. 09-81225-CIV-HURLEY, 2010 U.S. Dist. LEXIS 26915, at *3-4 (S.D. Fla. Mar. 15, 2010) (stating "The court has subject-matter jurisdiction over the state-law claims asserted in the amended complaint pursuant to 28 U.S.C. § 1367 because they are ancillary to the SEC enforcement action brought in Case No. 08-81565, over which this court has jurisdiction pursuant to 28 U.S.C. § 1331.").

[9] *Warfield v. Arpe*, No. 3:05-cv-1457-BUCHMEYER, 2007 U.S. Dist. LEXIS 12177, at *19-20 (N.D. Tex. Feb. 22, 2007) (stating "Accordingly, several district courts have found subject matter jurisdiction to exist in suits like this one, where a court-appointed receiver attempts to recover assets dissipated during the course of a Ponzi scheme by suing several individuals in an ancillary action based exclusively on state law." (citations omitted)).

[10] *Hafen v. Guyon*, No. 1:23-cv-74-CAMPBELL, 2024 U.S. Dist. LEXIS 82661, at *7 (D. Utah May 6, 2024) (citing *Pope v. Louisville, New Albany & Chicago Ry. Co.*, 173 U.S. 573, 577, (1899) and stating "The Supreme Court has long recognized that a receiver appointed to 'accomplish the ends sought and directed by' a suit with a proper basis for federal jurisdiction may proceed in ancillary jurisdiction on claims with no other independent basis for federal jurisdiction.").

62.     The District Court appointed the Receiver in the SEC Enforcement Action, over which the district court has jurisdiction pursuant to 28 U.S.C. § 1331, to accomplish the ends sought and directed by that action. As such, the Receiver may proceed under this Court's ancillary jurisdiction on claims with no other independent basis for federal jurisdiction.[11]

63.     The Receiver, in this action, sues Defendants, each of whom or which were involved with and received funds from Drive Planning. This is a well-recognized use of the ancillary jurisdiction of the federal courts.[12]

## B.    Personal Jurisdiction

64.     This Court has personal jurisdiction over Defendants because Defendants conducted business with Drive Planning, which was operating, conducting, engaging in, and carrying on a fraudulent business or venture in, among other locations, the Northern District of Georgia. The Commission payments that

---

[11] *See* note 9, *supra*.  *See also, Tcherepnin v. Franz,* 485 F.2d 1251, 1256 (7th Cir. 1973) ("Accordingly, the district court could properly rely upon its ancillary jurisdiction and need not have an independent jurisdictional base.").

[12] *Scholes v. Lehmann*, 56 F.3d 750, 753 (7th Cir. 1995) (finding federal ancillary jurisdiction over Illinois state law fraudulent transfer claims in an action by a receiver against transferees in a Ponzi scheme case); *Klein v. Am. Fin. Ltd. P'ship*, No. 4:10-CV-082-LODGE, 2010 U.S. Dist. LEXIS 66505, at * 8 (D. Idaho July 1, 2010) (citing to *Donell v. Kowell*, 533 F.3d 762, 769 (9th Cir. 2008) and stating "[I]t is within the Court's subject matter jurisdiction to adjudicate a state law cause of action against a third party alleged to have received a pay out from the Ponzi scheme.").

Defendants received from Drive Planning were proceeds from Drive Planning's fraudulent scheme conducted, in part, in the Northern District of Georgia. Drive Planning is incorporated in Georgia and had its headquarters in Alpharetta, Georgia.

65.    This Court has personal jurisdiction over Defendants by virtue of forthcoming personal service of process on them or their execution of a waiver of service in the various judicial districts in the United States in which they reside and conduct business. *See* Fed. R. Civ. P. 4(k)(1)(C) and 28 U.S.C. §§ 754 and 1692.

66.    Together 28 U.S.C. §§ 754 and 1692 provide the necessary statutory authority for the Receiver to have served CQ Consulting Services, LLC, Christina Quintana, RAL Financial Inc., Ryan Logan, Tracey Ferguson, TNT Legacy LLC, Monica Perez, Blue Services LLC, Meredith Bruce, STWC Financial LLC, Evolution Financial & Insurance Solutions, LLC, Susan Duke, Ryan F. Lawlor, Integrated Wealth Strategies, LLC, Ketler Bosse, Safe Life Solutions, LLC, Robin Rowan, Confia Financial Corp., Francisco Herrera, Terry Holman, Velomon LLC, James L. Beattey, John Williamson, Aimee Spencer, Juliana Mejia, FNJ Services LLC, Summerfield Brands, LLC, William N. Holt, Everett J. Stull, Adam Israel, Tara Mettler, Position Yourself Wealth Strategies, Audicol Services LLC, Ramon Donato Palacio, Angela Ruff, Jeffrey Lawrence Black, Jr., Largo Financial Services, LLC, Douglas Eze, Bluegenie Solutions, LLC, Remy Cruzmel, Banamerica Financial Group, Inc., Ricardo Aguirre, Woodford Consulting LLC, and Michael

Woodford in a district outside the territorial boundaries of this Court where the Receiver filed this ancillary action.

67.    The Receiver, to comply with those statutes, filed a copy of the complaint that commenced the SEC Enforcement Action and a copy of the Receivership Order in the Central District of California on August 23, 2024 (Case No. 2:24-mc-00101-UA), Southern District of Florida on August 12, 2025 (Case No. 9:5-mc-80995), Middle District of Florida on August 20, 2024 (Case No. 8:24-mc-00017-WFJ-UAM), District of New Jersey on August 23, 2024 (Case No. 2:24-mc-00105-JXN), District of New Hampshire on August 13, 2025 (Case No. pending), Southern District of Alabama on August 23, 2024 (Case No. 1:24-mc-00006-TFM-N), Northern District of Illinois on August 23, 2024 (Case No. 1:24-cv-07625), Southern District of Indiana on August 20, 2024 (Case No. 1:24-mc-00046-JRS-MKK), Middle District of Tennessee on August 23, 2024 (Case No. 3:24-mc-00008), Eastern District of Virginia on August 13, 2025 (Case No. pending), Middle District of North Carolina on August 23, 2024 (Case No. 1:24-mc-00017-UA), Southern District of Texas on August 23, 2024 (Case No. 4:24-mc-01364), District of Maryland on August 27, 2024 (Case No1:24-mc-00405), and in the  Eastern District of Texas on August 23, 2024 (Case No. 6:24-mc-00012-JCB).

68.     In cases where the court exercises personal jurisdiction by virtue of a federal statute authorizing nationwide service of process, minimum contacts with the United States suffice.

69.     This Court has personal jurisdiction over Defendants because they all are located, reside, and conduct business in the United States and have sufficient minimum contacts with the United States.

## IV.    VENUE

70.     Venue is proper in this district pursuant to 28 U.S.C. §§ 754, 1692 because the SEC Enforcement Action, in which the Receiver was appointed, is pending in this district. This Court has venue over the SEC Enforcement Action and therefore has venue over this ancillary action the Receiver brings to accomplish the objectives of the Receivership Order.

71.     The Court entered the Receivership Order on August 13, 2024, and within ten (10) days the Receiver opened miscellaneous proceedings and filed Notices of Receivership (including the SEC Complaint and the Receivership Order) in the following districts: Central District of California on August 23, 2024 (Case No. 2:24-mc-00101-UA), Southern District of Florida on August 12, 2025 (Case No. 9:5-mc-80995), Middle District of Florida on August 20, 2024 (Case No. 8:24-mc-00017-WFJ-UAM), District of New Jersey on August 23, 2024 (Case No. 2:24-mc-00105-JXN), , Southern District of Alabama on August 23, 2024 (Case No. 1:24-

mc-00006-TFM-N), Northern District of Illinois on August 23, 2024 (Case No. 1:24-cv-07625), Southern District of Indiana on August 20, 2024 (Case No. 1:24-mc-00046-JRS-MKK) Middle District of Tennessee on August 23, 2024 (Case No. 3:24-mc-00008), , Middle District of North Carolina on August 23, 2024 (Case No. 1:24-mc-00017-UA), Southern District of Texas on August 23, 2024 (Case No. 4:24-mc-01364), District of Maryland on August 27, 2024 (Case No1:24-mc-00405), and in the  Eastern District of Texas on August 23, 2024 (Case No. 6:24-mc-00012-JCB).

72.    The Receiver opened miscellaneous proceedings and filed Notices of Receivership (including the SEC Complaint and the Receivership Order) in the following districts: Southern District of Florida on August 12, 2025 (Case No. 9:5-mc-80995); District of New Hampshire on August 13, 2025 (Case No. pending); and Eastern District of Virginia on August 13, 2025 (Case No. pending).

## V.    CONDITIONS PRECEDENT

73.    All conditions precedent to the bringing of this action have been performed, waived, or satisfied, or have occurred.

## VI.    GENERAL FACTUAL AND PROCEDURAL BACKGROUND

### *The SEC Commences Its Enforcement Action*

74.    On August 13, 2024, the SEC filed its complaint ("SEC Complaint") against Drive Planning and Burkhalter and various relief defendants, which

23

commenced the SEC Enforcement Action. *See* Case No. 1:24-cv-03583-VMC [ECF No. 1].

75.     The SEC immediately obtained preliminary injunctive relief, and other emergency relief. *See id.* ECF Nos. 2, 11, 16.

### *The Court Appoints the Receiver and Ousts Burkhalter and His Accomplices*

76.     The SEC, along with filing the SEC Complaint, sought and obtained appointment of the Receiver through the Receivership Order. *See id.* ECF Nos. 2, 10.

77.     The Receivership Order created a receivership estate ("Receivership Estate") comprised of all of the assets of Drive Planning, which became a receivership entity ("Receivership Entity"), whether those assets were owned directly by Drive Planning or were in the possession of third parties subject to claims by the Receivership Estate to avoid, recover, and disgorge the improper transfers made by wrongdoers. *See id.* ECF No. 10.

78.     The Receivership Order authorizes the Receiver to investigate and prosecute claims against individuals and entities who/that improperly received funds from Drive Planning pre-receivership. *See id.* Further, pursuant to the requirement in the Receivership Order that the Receiver obtain authority from the Court presiding over the SEC Enforcement Action to commence certain ancillary actions, the

Receiver sought and obtained authority from that court to commence this action asserting the claims set forth herein. *See id*. ECF Nos. 229, 234.

## VII.  FACTUAL BASIS FOR THE RECEIVER'S CLAIMS FOR RELIEF

### *Drive Planning Was a Ponzi Scheme and Insolvent from 2020 to 2024*

79.    Drive Planning operated as a Ponzi scheme from 2020 through the SEC's commencement of the SEC Enforcement Action in August 2024.

80.    Drive Planning generated little to no profits from legitimate business operations.

81.    Drive Planning acquired cash from individuals who and entities that believed they were "investors" in an investment contract (an illegal, unregistered security) and repaid those prior-in-time "investors" with money received from later-in-time "investors" because there were no real investments generating any gains or returns.

82.    To make matters worse, Burkhalter and his accomplices also siphoned off funds for themselves from this Ponzi scheme cycle of new money used to pay earlier obligations, which exacerbated the need to increase the velocity of infusions of new cash.

83.    Drive Planning, without actual assets, income producing investments, or other business operations, was insolvent during the material periods of time between 2020 to 2024.

84.     Burkhalter and his accomplices drove it deeper and deeper into insolvency with each new dollar they accepted from an "investor" by creating a liability without any way to repay that liability other than with new "investor" money.

85.     Ultimately, the Drive Planning Ponzi scheme was dangerously appealing because it involved an enticing product, a persuasive and popular sales team, and slick and appealing marketing.

### *The "R.E.A.L." Opportunity Ponzi Product—An Illegal, Unregistered Security*

86.     Burkhalter, Bradford, Linarducci, Quintana, and the other Agents promoted, offered, sold, and solicited the purchase of illegal, unregistered securities in the form of short-term promissory notes promising quarterly "interest" payments amounting to 10%, which annualized to over 40%.

87.     Drive Planning branded its primary product as the "R.E.A.L. Opportunity" or "R.E.A.L. Plan", which stood for **R**eal **E**state **A**cceleration **L**oans— deceptively clever but dangerously illegal.

88.     At no time did Drive Planning attempt to register the "R.E.A.L. Opportunity" or any other "investment" product as securities under any federal or state laws.

89.    At no time was the "R.E.A.L. Opportunity" or any other "investment" product Drive Planning and the Agents offered to the public exempted from registration under federal or state securities laws.

90.    At no time did Drive Planning or any Agent obtain an "opinion letter" from a law firm opining that the "R.E.A.L. Opportunity" or any other "investment" product that Drive Planning and the Agents offered to the public either (i) were not securities for purposes of federal and state securities laws; or (ii) were securities but were exempt from registration under the federal and state securities laws.

91.    Neither the "R.E.A.L. Opportunity," nor any other "investment" product that Drive Planning and the Agents sold to the public constituted "commercial promissory notes" for purposes of federal and state securities laws despite their being labeled as "promissory notes."

92.    Neither the "R.E.A.L. Opportunity," nor any other "investment" product that Drive Planning and the Agents sold to the public, constituted short-term, high-quality instruments issued to fund operations and sold only to sophisticated investors.

93.    Neither the "R.E.A.L. Opportunity," nor any other "investment" product that Drive Planning and the Agents sold to the public, constituted notes of "prime quality." In reality, Drive Planning did not use "investor" money to loan to

real estate developers, rather, it simply paid older investors "fictitious profits," Agents Commissions, and enriched Burkhalter and his inner circle.

94.    Drive Planning and the Agents offered the "R.E.A.L Opportunity" and other investment products to small-scale investors in the general public, not to typical, sophisticated, experienced purchasers of commercial paper.

95.    Drive Planning and the Agents sought to tap the savings, retirement accounts, and home equity of middle- and working-class people, not sophisticated investors, and in many cases encouraged investors to take out high-interest loans to then "invest" those loan proceeds with Drive Planning.

96.    Drive Planning and the Agents represented to the public: "We are passionate about helping regular people grow their wealth the way the uber-wealthy do."

97.    Drive Planning and the Agents promoted to the public that the "R.E.A.L. Opportunity" was an accessible "investment" and made the following sales pitch in their public promotional offering materials:

- If you have $20,000 you can participate.

- You can use money from your retirement account.

- You do NOT have to be an Accredited Investor.

- You can use money from savings.

- You can use money from a line of credit.

98.    To maximize the amount of money Drive Planning and the Agents could extract from each "investor" they pushed "investors" toward "hard-money" home-equity lines of credit, often with BHG Financial, Inc.

99.    Drive Planning and the Agents prompted to the public that the "R.E.A.L. Opportunity" was an accessible "investment" and made the following sales pitch in their public promotional offering materials: "If you have good credit and good income we may be able to help you receive up to $200,000 for the REAL plan."

100.    Drive Planning and the Agents targeted unsophisticated investors and advertised and offered the "R.E.A.L. Opportunity" for sale to the public nationwide and certain international markets and accepted "investments" from "investors" across the nation and internationally.

101.    Drive Planning prepared, and it and the Agents circulated, public offering documents in the form of, among other things, PDF brochures that were transmitted by electronic means, such as email and text message, and made available on Drive Planning's website www.driveplanning.com.

102.    Drive Planning and the Agents informed prospective "investors" that they did not need to be "accredited investors," as that term is defined by the federal securities regulations.

103.   The "R.E.A.L. Opportunity" purported to be a short-term interest-bearing loan (10% paid quarterly, which equates to 40% annually) that Drive Planning used for bridge loans in the commercial real estate sector. But Drive Planning did not use "investor" funds for the promised purpose.

104.   The "R.E.A.L. Opportunity" involved an "investment" of money, as each "investor" gave Drive Planning money expecting repayment of that money plus a "return" of extra money over and above what they had "invested," in the form of interest payments or profits.

105.   Drive Planning and the Agents, through the "R.E.A.L. Opportunity," promised "investors" a fixed rate of return.

106.   Drive Planning and the Agents promised "investors" there was collateral yet no "investor" was ever provided with any document or instrument that would actually pledge collateral to any "investor."

107.   Almost all of the property Drive Planning and the Agents told "investors" was their collateral was not even titled in the name of or owned by Drive Planning and there were not documents through which those separated entities guaranteed any obligation of Drive Planning to the Drive Planning "investors."

108.   Had the Agents asked these simple questions concerning the documentation that allegedly pledged collateral to the "investor" those Agents were

bringing into the Drive Planning Ponzi scheme, and profiting from, the Agents would have discovered the misrepresentations they were making to the public.

109.   Drive Planning's "investments" involved the "pooling" of "investor" funds as a result of which the "investors" shared all the risks and benefits of the business enterprise (or lack thereof in the case of Drive Planning).

110.   The "R.E.A.L Opportunity" was marketed as "100% Passive Income from Real Estate Investments."

111.   Drive Planning's "investors" were dependent upon the expertise and efforts of the investment promoter for their returns—100% passive income from the real estate investments—Drive Planning claimed to make on behalf of "investors".

112.   Said differently, the fortunes of the Drive Planning's "investors" depended upon the Drive Planning personnel and Agents or the third parties to whom Drive Planning purportedly made the loans or partnered with on alleged the real estate projects.

113.   Under Drive Planning's "investment program," "investors" expected their profits (in the form of what they were told would be interest payments) to come solely from the efforts of others.

114.   Drive Planning and the Agents, in their public offering and marketing materials, provided to the public (nationwide and internationally), described how they claimed the "R.E.A.L. Opportunity" worked:

> We have a program that helps real estate developers get more projects, even while they're still finishing up others. The thing is, traditional lenders like banks usually won't offer this kind of loan because all of the regulations and red tape involved. But we're different – we only work with developers who have a track record of success, and they agree to share their profits with us and our lenders (which is you!). Our program is called the REAL Plan, and it basically allows developers to speed up their business growth, while also helping our lenders (you!) grow their wealth. It's a win-win situation for everyone involved!

115. Drive Planning's "investors" did not loan money to real estate developers but instead Drive Planning claimed to pool the "investors'" money to then loan it to real estate developers such that "investor" money was pooled for investments purposes that would then generate a promised fixed rate of return.

116. Drive Planning did not permit its "investors" to be involved with the alleged real estate loans or with the purported real estate investment partners.

117. Instead, Drive Planning "investors" entirely relied upon what they were told were the entrepreneurial or managerial efforts of Drive Planning personnel and the real estate developers.

118. Drive Planning's "investors" had no control over their "investments," to whom their money was allegedly allocated, the purported project for which the loan was made, or any other aspect of the "investment."

119. Drive Planning's personnel (the promoters) purportedly placed the "investors" funds with real estate developers constituting the "essential managerial efforts" of Drive Planning's "investment" product.

120. The two choices Drive Planning's "investors" had were: (i) how much to "invest"; and (ii) when to "redeem" their "investment" or "rollover" their "investment."

121. The "short-term" nature of Drive Planning's "R.E.A.L. Opportunity" has no impact on whether it falls within the definition of a security.

122. Drive Planning's "R.E.A.L Opportunity" was designed to be marketed by Drive Planning and the Agents as, and subscribed to by "investors," solely for investment purposes. That was the motivation understood by all parties involved.

123. Drive Planning and the Agents marketed the "R.E.A.L. Opportunity" to the public as a high rate of return product (much higher than the average stock market investment returns) at 10% every three months and annualized at over 40%.

124. Drive Planning and the Agents, in the public offering memorandum they provided to the public to solicit and secure investor funds in the "R.E.A.L Opportunity," provided the following Table to demonstrate the annual "return" or "profit" on a $100,000 "investment:"

| COMPOUND INTEREST CALCULATOR | |
|---|---|
| INPUTS | |
| Real loan | $100,000 |
| Quarters/Year | 4 |

| Interest Rate | 10% |
|---|---|
| **RESULT** | |
| Future value | $146,410.00 |

125.   Drive Planning and the Agents marketed the "R.E.A.L. Opportunity" as "100% passive income from real estate investment" so the public, including the "investors" understood the "R.E.A.L. Opportunity" was an investment.

126.   There were no risk-reducing factors, such as an alternative regulatory scheme that would have reduced the risk to the "investors" in this case. There were no actual collateral instruments to protect "investors," nor was there any insurance in place to protect "investors" against loss. Other than the federal securities law, there are no other regulatory schemes governing Drive Planning and the Agents' solicitation, issuance, and handling of the "R.E.A.L. Opportunity."

127.   None of the "investments" Drive Planning and the Agents offered to "investors" were registered under the federal securities laws.

128.   Drive Planning and its Agents, by soliciting and securing "investors", and receiving "investor" money pertaining to the "R.E.A.L. Opportunity" engaged in the sale of unregistered securities in violation of the federal securities laws and Georgia law pertaining to immoral and illegal contracts. *See* O.C.G.A. § 13-8-1.

### *The Popular and Persuasive (But Entirely Unqualified) Sales Team*

129.   Burkhalter, Bradford, Linarducci, Quintana, and the other Agents were the face of the Drive Planning Ponzi scheme.

130.   Burkhalter, an insurance, mutual funds, and annuity salesman, is entirely unqualified to sell (and equally unsophisticated about) the purported short-term real estate bridge loans he claimed Drive Planning was offering in the form of the "R.E.A.L. Opportunity." That much was evident in his presentations to "investors."

131.   Burkhalter was never licensed with the SEC to sell securities, and a simple check on www.brokercheck.finra.org confirms as much.

132.   A simple search on www.brokercheck.finra.org also confirms that Drive Planning was not registered with the SEC.

133.   The Agents and "investors" could have, but failed to, performed simple due diligence from publicly available sources that would have raised several "red flags" and invited further due diligence that would have revealed information sufficient to uncover the Drive Planning Ponzi scheme.

134.   What Burkhalter and the Agents lacked in credentials and financial acumen; they made up for in personality.

135.   For example, Bradford, the most vocal of the Agents, heavily promoted himself and Drive Planning in serial media appearances on television, podcasts, and magazine interviews spreading the word about Drive Planning and the "investment" products Drive Planning offered to the public.

136.   Burkhalter liked to have fun and had expensive taste, which his how he connected with the Agents and "investors"

137.   Burkhalter used his spendthrift disposition to project success and legitimacy through utilizing "investor" funds to purchase for himself luxury residential real property, exotic sports cars, a yacht, a cattle ranch, first-class and private jet travel, professional sports team tickets, and sponsorship of an Indy Car (#67) racecar team with driver Elliot Cox.





138.   Burkhalter leveraged this outward display of wealth—like most Ponzi schemers do—to entice, encourage, and convince prospective "investors" that the Ponzi scheme was legitimate, actually working, and could work for them—the

"investors"—if they just handed Burkhalter and the Agents, all of their money, whether in cash in a bank account, in a secure retirement account like an IRA or 401(k), or in available home equity convertible into cash through high interest loans.

139. But the veneer was thin (almost transparent) and simple questions like: "May I please have your resume or C.V.?", or "May I please have three industry references?" would have lifted the veil and exposed Burkhalter for what he really was—a Ponzi schemer out to enrich himself at everyone else's expense.

140. Regardless of how much money Burkhalter and certain Agents flashed and how many getaways to places like Hawaii, Cabo San Lucas, Mexico, and the Greek Isles, Burkhalter and certain of the Agents sponsored using the money of Drive Planning's Ponzi scheme's victims, they alone from Alpharetta, Georgia, could not reach across the nation and internationally to raise $380 million.

141. So, Burkhalter, as the architect of the Drive Planning Ponzi scheme, tapped into an enthusiastically willing and unquestionably able cohort of Agents that unscrupulously risked the fortunes (no matter how big or small) of their clients, customers, followers, friends, and family in exchange for Commission payments from "investor" funds that, in some cases, amounted to millions of dollars.

142. Quintana is a prime example of an Agent who willingly exposed her friends, family, clients, customers, and followers to the Drive Planning Ponzi scheme so that she could profit from her victimization of these individuals. For her

role in the Ponzi scheme, she received approximately $4.3 million in commissions from 2020 to 2024 directly and through her alter-ego Defendant CQ Consulting Services, LLC. Her actions helped spread the Ponzi scheme and fuel its growth.

143.   The other Agents sued in this ancillary action followed suit with Quintana and spread the Drive Planning Ponzi scheme throughout their friends, family, client base, and to whomever else entrusted them with their money and in return received hundreds of thousands, if not millions, of dollars in Commissions for their role in the Drive Planning Ponzi scheme.

144.   Indeed, without the Agents' complicity, Burkhalter would never have conned "investors" out of approximately $380 million.

### The Slick and Appealing (But Deceptive) Marketing

145.   Drive Planning's slogan was "Keep More, Make More, and Live More."  Catchy to its core.

146.   Drive Planning, largely through the Agents, touted secrets to unlock the strategies generally only known to and utilized by the wealthy and, by utilizing these strategies, "normal" people could, themselves, become wealthy.

147.   Drive Planning capitalized on the COVID-19 Pandemic which befell upon the nation and the world from 2020 and through 2023 by utilizing its own website www.driveplanning.com and social media to reach people who were trapped

at home and often glued to their electronic devices viewing their social media accounts.

148.  Drive Planning also used LinkedIn, Instagram, Facebook, YouTube, and other social media platforms to lure in "investors" to purchase the "R.E.A.L. Opportunity" by displaying the purported fruits of that product in the form of the luxury real estate, vehicles, and vacations on which Burkhalter and certain Agents spent "investor" funds.

149.  Social media allowed Drive Planning to reach thousands of people during "lockdown" and spread the Ponzi scheme nationwide and into certain international markets.

150.  Drive Planning's marketing also featured their getaways to exotic locations like Hawaii and Cabo San Lucas, Mexico at which people, many of whom were Agents, partied at luxury venues and portrayed as if Drive Planning's "investments" made it possible for everyone to achieve those types of experiences. But every getaway was funded with "investor" money—money the "investors" thought was being utilized for real estate bridge loans, not top shelf open bars at fancy resorts and venue spaces in glamorous locations.

151.  Drive Planning's website, www.driveplanning.com, featured a page entitled "Our Team" upon which the Agents authorized Drive Planning to feature their profiles (often with their pictures) representing to the public that the Agents

39

were Drive Planning "Financial Consultants" and were in fact representing Drive Planning and selling Drive Planning's products.

152.   The Agents, by placing their profiles on Drive Planning's website, represented to the public that they themselves endorsed Drive Planning as a firm, Drive Planning's products, including the "R.E.A.L. Opportunity," and gave legitimacy to the Ponzi scheme through leveraging their reputation, credentials, and clientele to benefit themselves in the form of the Commissions they received from "investor" funds.

153.   Drive Planning provided the Agents with email addresses which included some form of the Agent's name @driveplanning.com.

154.   The Agents also took part in the marketing efforts by utilizing their own platforms and followers to lure in "investors" and reap the benefits through hefty Commissions.

155.   For example, Quintana presently has approximately 14,200 followers on Instagram—fertile soil for spreading the Drive Planning Ponzi scheme. She claims to be a "Financial Consultant" but from 2020 to 2024 she was peddling the Drive Planning Ponzi scheme product and in return receiving millions of dollars for her assistance.

156.   Believe it or not, Quintana received approximately $80,000 in Commissions on June 14, 2024, *which is two days after Burkhalter was interviewed*

*under oath by the SEC and asserted his Fifth Amendment privilege against self-incrimination to every question that involved Drive Planning.*

157.  Ultimately, each of the Agents sued in this ancillary action brought in many "investors" through their own channels and for those deeds received ill-gotten gains in the form of the Commissions the Receiver sues to avoid, recover, and disgorge in this ancillary action.

## VIII.  LEGAL BASIS FOR THE RECEIVER'S CLAIMS

***Burkhalter and Bradford Asserted Their Fifth Amendment Privilege Against Self-Incrimination to Every Question the SEC Asked About Drive Planning in Their June 2024 Investigation Interviews***

158.  The SEC, prior to commencing the SEC Enforcement Action, interviewed Burkhalter on June 12, 2024 in its investigation as to whether Drive Planning had committed violations of certain provisions of the federal securities laws. *See* SEC Enforcement Action, Case No. 1:24-cv-03583-VMC [ECF No. 2-14].

159.  Burkhalter, in response to each of the SEC's questions concerning Drive Planning, asserted his Fifth Amendment privilege against self-incrimination.

160.  The SEC, prior to commencing the SEC Enforcement Action, interviewed Bradford on June 17, 2024 in its investigation as to whether Drive Planning had committed violations of certain provisions of the federal securities laws. *See* SEC Enforcement Action, Case No. 1:24-cv-03583-VMC [ECF No. 2-16].

161.    Bradford, in response to each of the SEC's questions concerning Drive Planning, asserted his Fifth Amendment privilege against self-incrimination.

162.    Burkhalter's and Bradford's invocation of their Fifth Amendment privileges against self-incrimination supports the Court in this ancillary action drawing an adverse inference concerning Burkhalter's operation of Drive Planning as a Ponzi scheme and forecloses any Defendant's attempt to utilize the testimony of Burkhalter or Bradford to negate the conclusion that Drive Planning operated as a Ponzi scheme from 2020 to 2024.

### *The Receiver Has Standing to Bring Fraudulent Transfer and Unjust Enrichment Claims against the Agents to Avoid, Recover, and Disgorge the Commissions*

163.    The Receiver has standing to assert claims against third parties who/that received funds, caused damage, or who/that are in possession of assets belonging to the Receivership Estate. *See* 28 U.S.C. §§ 754 and 1692; *Scholes v. Lehman*, 56 F.3d 750 (7th Cir. 1995); *Donell v. Kowell*, 533 F. 3d 762 (9th Cir. 2008); *Perkins v. Haines*, 661 F.3d 623 (11th Cir. 2011); *Wing v. Dockstader*, 482 F. App'x 361 (10th Cir. 2012); *Warfield v. Byron*, 436 F.3d 551 (5th Cir. 2006).

164.    The Receiver has standing to recover payments Drive Planning made to the Agents in the form of Commissions, as Drive Planning made these payments solely to promote, continue, expand, and further, the size and participation of the illicit Drive Planning Ponzi scheme, and such payments constitute avoidable and

recoverable fraudulent transfers and inequitable and unjust benefits subject to disgorgement under the unjust enrichment equitable claim.

165.   The Court's removal of Burkhalter and his accomplices, appointment of the Receiver, and creation of the Receivership Estate and Receivership Entity Drive Planning, cleansed the Receivership Estate and Receivership Entity Drive Planning such that the Receiver has standing to bring claims to recover the payments pre-Receivership Entity Drive Planning made to the Agents in the form of the Commissions when Drive Planning was entirely controlled by Burkhalter and his accomplices. *See Hays v. Adam*, 512 F. Supp. 2d 1330 (N.D. Ga. 2007).

### The Receiver Brings the Claims Within the Applicable Statutes of Limitations and Applicable Equitable Tolling Doctrines

166.   GUVTA provides that claims for actual fraudulent transfers (*i.e.*, transfers made with actual intent to defraud a creditor) must be brought "within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was or could reasonably have been discovered by the claimant". *See* O.C.G.A. § 18-2-79.

167.   The Receiver was appointed on August 13, 2024, has diligently investigated Drive Planning's financial records, and, within approximately three

months after his appointment[13] began to identify claims that may be subject to this one-year discovery rule.

168.   The Receiver sues Defendants to recover Commissions paid to them as actual fraudulent transfers under O.C.G.A. § 18-2-74(a)(1) that were made: (a) within one year after the transfer was or could reasonably have been discovered by the Receiver; and (b) within four years after the transfer was made.

169.   The Receiver sues Defendants to recover Commissions paid to them as constructive fraudulent transfers under O.C.G.A. § 18-2-74(a)(2) that Drive Planning made within four years after Drive Planning made the transfer.

170.   The Receiver sues Defendants, under the Georgia common law theory of unjust enrichment, to recover Commissions Drive Planning paid to Defendants within the four-year period of time prior to the date upon which the Receiver filed this ancillary complaint. *See* O.C.G.A. § 9-3-26.

171.   The Receiver sues Defendants, under the Georgia common law theory of unjust enrichment, to recover Commissions Drive Planning paid to Defendants outside of the four-year period prior to the date upon which the Receiver filed this

---

[13] The Receiver did not and could not identify any claims to recover the Commissions on the date of his appointment; rather, he discovered them after he obtained Drive Planning's bank records and, with the assistance of his forensic accountant, reviewed those records and began to reconstruct Drive Planning's accounts, which process commenced within approximately three months of his appointment. Nevertheless, in an abundance of caution, the Receiver is commencing this action within one year of his appointment.

ancillary complaint based upon the doctrines of equitable tolling, equitable estoppel, and delayed discovery, and the mandate of the Receivership Order, which are supported by the following facts:

a. Drive Planning and the Agents actively concealed the nature of Drive Planning's Ponzi scheme, and the Commissions Drive Planning paid to the Agents, to perpetuate the Ponzi scheme by bringing in new "investors" so that their money could be used to pay older "investors" "returns" to keep the scheme alive and running, including the payment of Commissions;

b. Drive Planning and the Agents have actual intent to mislead or conceal their sales of unregistered and illegal securities, which involve moral turpitude, and such sales were the very acts for which Drive Planning paid the Agents the Commission;

c. The Agents owed fiduciary duties to Drive Planning through the principal and agent relationship of trust and confidence and, therefore, had a duty to disclose illegal and improper sale of unregistered securities so if they acted in mere silence such silence is sufficient to toll the statute of limitations;

d. The Agents owed fiduciary duties to the "investors" to whom/which they sold Drive Planning's illegal unregistered securities because an agent that takes it upon himself/herself/itself to sell a financial product to the public assumes a duty to the individual or entity to whom or

45

which he/she/it sells that product to have reasonable knowledge about the product or investment strategy being recommended, including information discovered from the mandatory investigation the financial performance of and personnel background of the investment manager and offering company because an agent should never rely solely on a sponsor or issuer's evaluation of an investment product. Under that duty, an Agent's mere silence concerning the fraud that was discovered or should have been discovered upon discharge of his/her/its duty to the public is sufficient to toll the statute of limitations; and

   e.    The Receivership Order mandates that "as to a cause of action accrued or accruing in favor of the Receivership [Entity] against a third person or party, any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect as to that cause of action." *See* Case No. 1:24-cv-03583-VMC ECF No. 10 at ¶ 34. The injunction against the Receiver commencing legal proceedings was not lifted until August 7, 2025. *See id*. ECF No. 234.

172.   The Receiver brings this ancillary complaint within one year after his appointment. He could not have discovered the Commission payments prior to his appointment because Drive Planning and the Agents controlled the records that revealed the Commission payments, and the Receiver did not have access to the

records that revealed Drive Planning's Ponzi scheme and the Agents' receipt of the Commissions until after his appointment. *See* note 13, *supra*.

173.   The Receiver has exercised diligence in administering this massive Ponzi scheme and the potential claims against the more than 160 Agents for Commissions and "investors" for "net gains" along with the multitude of other activities referenced on the docket in the SEC Enforcement Action and in the Receiver's Status Reports.

174.   The Receiver's claims to recover the Commissions, therefore, are timely and within the periods dictated by applicable statutes of limitation or tolling doctrines.

## IX.   COMMISSION PAYMENTS TO DEFENDANTS SUBJECT TO AVOIDANCE, RECOVERY, AND DISGORGEMENT

175.   The Receiver sues 46 Agents in this first ancillary action to avoid, recover, and disgorge, Commission payments in the total amount of $27,574,178.54 Drive Planning made to them when it was running its Ponzi scheme from 2020 to 2024, which the Receiver describes in detail in this section and the respective transfer schedules the Receiver attaches to, and incorporates into, this ancillary complaint as ***Exhibits A to EE*** ("Commission Schedules").

176.   Law and equity require Agents return the Commissions Drive Planning paid to them for their role in furthering the Ponzi scheme, which provided no value

as they were received from an illegal enterprise selling unregistered securities and paying prior "investors" with later "investors" money.

The Receiver will combine those funds with other funds in the Receivership Estate to make an equitable distribution to all "investors" who suffered "net losses."

### *Christina Quintana and Her Alter-Ego CQ Consulting Services, LLC*

177.   From May 20, 2022 through June 14, 2024, Drive Planning made 55 transfers of funds in the total amount of $3,789,405.11 to CQ Consulting Services, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Defendant CQ Consulting Services, LLC, attached hereto as *Exhibit A*.

178.   Upon information and belief, Defendant CQ Consulting Services, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Christina Quintana.

179.   The Receiver demands and seeks to avoid, recover, and disgorge from Christina Quintana and CQ Consulting Services, LLC the $3,789,405.11 in Commissions Drive Planning paid to them.

180.   From February 23, 2021 through May 6, 2022, Drive Planning made 27 transfers of funds in the total amount of $460,039.00 to directly to Defendant Quintana as payments for her role in expanding the Ponzi scheme by securing

additional funds from new "investors." *See* Summary of Commission Defendant Quintana, attached hereto as ***Exhibit B***.

181. From February 25, 2021 through April 20, 2023, Defendant Quintana made 5 transfers totaling $175,000 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

182. From November 27, 2020 through April 15, 2022, Defendant Quintana received $86,645.00 in purported "profits" on her "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity and constituted "false profits." *See id*.

183. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Quintana net amount $358,673.00 (representing the total Commissions and "false profits" received by Defendant Quintana, less the amount of her "investments") in Commissions Drive Planning paid to her.

### *Ryan A. Logan and His Alter-Ego RAL Financial Inc.*

184. From July 29, 2022 through February 16, 2024, Drive Planning made 48 transfers of funds in the total amount of $3,151,020.25 to Defendant RAL Financial, Inc. as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Defendant RAL Financial, Inc., attached hereto as ***Exhibit C***.

185.   Upon information and belief, Defendant RAL Financial, Inc. subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Ryan A. Logan.

186.   From August 30, 2022, Defendant Ryan A. Logan made 4 transfers through his entities RRL Limited, LLC and RRL Giving, LLC totaling $175,000 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

187.   The Receiver demands and seeks to avoid, recover, and disgorge from Defendants Ryan A. Logan and RAL Financial Inc. the net amount of $2,976,020.25 (representing the total Commissions received by Defendants RAL and Logan, less the amount of their "investments") in Commissions Drive Planning paid to them.

### *Tracey Ferguson and Her Alter-Ego TNT Legacy, LLC*

188.   From May 20, 2022 through June 30, 2023, Drive Planning made 30 transfers of funds in the total amount of $1,855,654.14 to Defendants TNT Legacy, LLC and Tracey Ferguson Manager ("Ferguson Defendants") as Commission payments for their role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Commissions to the Ferguson Defendants, attached hereto as *Exhibit D*.

189.   Upon information and belief, TNT Legacy, LLC subsequently transferred all funds it received from Drive Planning to its alter-ego, sole owner, and manager, Tracey Ferguson.

190.    From February 24, 2021 through January 18, 2022, the Ferguson Defendants made 2 transfers totaling $45,000 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

191.    From November 12, 2021 through June 30, 2023, the Ferguson Defendants received $585,130.45 in "false profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. Defendant provided no reasonably equivalent value in exchange for these "false profits." *See id*.

192.    The Receiver demands and seeks to avoid, recover, and disgorge from the Ferguson Defendants the net amount of $2,395,784.59 (representing the total Commissions and "false profits" received by the Ferguson Defendants, less the amount of their "investments") in Commission Drive Planning paid to them.

### *Monica Perez and Her Alter-Ego Blue Services, LLC*

193.    From January 28, 2022 through June 14, 2024, Drive Planning made 58 transfers of funds in the total amount of $2,232,467.79 to Defendant Blue Services, LLC and from July 30, 2021 through February 11, 2022, Drive Planning made 13 transfers of funds in the total amount of $27,761.00  to Defendant Monica Perez as payments for their role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Commission of Transfers to Defendant Blue Services, LLC and Monica Perez, attached hereto as ***Exhibit E***.

194. Upon information and belief, Defendant Blue Services, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Monica Perez.

195. The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Monica Perez and Blue Services, LLC the $2,260,228.79 in Commissions Drive Planning paid to them.

### Meredith Bruce and Her Alter-Ego SDWC Financial, LLC

196. From May 20, 2022 through June 14, 2024, Drive Planning made 55 transfers of funds in the total amount of $1,951,200.48 to Defendant SDWC Financial, LLC as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Defendant SDWC Financial, LLC, attached hereto as *Exhibit F*.

197. Upon information and belief, SDWC Financial, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Meredith Bruce.

198. From February 18, 2022 through September 14, 2023, Defendant Meredith Bruce made transfers totaling $250,000 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

199. From February 25, 2022 through May 12, 2022, Defendant Meredith Bruce received $36,200.00 in purported "profits" on the Investments, which were,

in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. Defendant Bruce provided no reasonably equivalent value in exchange for these "false profits." *See id.*

200.   The Receiver demands and seeks to avoid, recover, and disgorge from Meredith Bruce and SDWC Financial, LLC   the net amount of $1,737,400.48 (representing the total Commissions and "false profits" received by these defendants, less the amount of their "investments") in Commissions Drive Planning paid to them.

### *Evolution Financial & Insurance Solution*

201.   From April 7, 2023 through June 14, 2024, Drive Planning made 28 transfers of funds in the total amount of $1,431,929.29 to Defendant Evolution Financial & Insurance Solution as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Evolution Financial & Insurance Solution, attached hereto as ***Exhibit G***.

202.   The Receiver demands and seeks to avoid, recover, and disgorge from Evolution Financial & Insurance Solution the $1,431,929.29 in Commissions Drive Planning paid to it.

### Susan Duke

203.   From January25, 2021 through June 14, 2024, Drive Planning made 72 transfers of funds in the total amount of $1,787,400.09 to Defendant Susan Duke as payments for her role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Transfers to Susan Duke, attached hereto as ***Exhibit H***.

204.   From May 25, 2021 through May 9, 2024, Defendant Susan Duke, individually, and through her entities Three Point Planning LLC and Three Point Retirement Trust made 17 transfers totaling $542,001.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

205.   The Receiver demands and seeks to avoid, recover, and disgorge from Susan Duke the net amount of $1,243,263.29 (representing the total Commissions received by this Defendant, less the amount of "Investments") in Commissions Drive Planning paid to her.

### Ryan F. Lawlor

206.   From May 19, 2023 through June 14, 2024, Drive Planning made 28 transfers of funds in the total amount of $1,055,678.01 to Defendant Ryan F. Lawlor as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Transfers to Ryan Lawlor, attached hereto as ***Exhibit I***.

207.   The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Lawlor the $1,055,678.01 in Commissions Drive Planning paid to him.

### Integrated Wealth Strategies

208.   From May 20, 2022 through May 31, 2024, Drive Planning made 18 transfers of funds in the total amount of $1,054,698.73 to Defendant Integrated Wealth Strategies ("IWS") as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to IWS, attached hereto as ***Exhibit J***.

209.   The Receiver demands and seeks to avoid, recover, and disgorge from IWS the $1,054,698.73 in Commissions Drive Planning paid to it.

### Ketler Bosse

210.   From August 26, 2022 through June 14, 2024, Drive Planning made 36 transfers of funds in the total amount of $840,325.26 to Defendant Ketler Bosse as Commission payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Commissions to Ketler Bosse, attached hereto as ***Exhibit K***.

211.   On April 8, 2024, Ketler Bosse, through his entity Bosse Future Capital Group made a transfer totaling $50,000.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

212.   The Receiver demands and seeks to avoid, recover, and disgorge from Ketler Bosse the net amount of $790,325.26 (representing the total Commissions received by this Defendant, less the amount of "Investments") in Commissions Drive Planning paid to him.

### Robin L. Rowan and Her Alter-Ego Safe Life Solutions, LLC

213.   From May 20, 2022 through June 14, 2024, Drive Planning made 43 transfers of funds in the total amount of $763,326.29 to Defendant Safe Life Solutions, LLC as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Safe Life Solutions, LLC, attached hereto as ***Exhibit L***.

214.   Upon information and belief, Safe Life Solutions, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Robin L. Rowan.

215.   From September 9, 2022 through February 5, 2024, Defendant Robin L. Rowan, individually, and through her entity Safe Life Solutions, LLC made 4 transfers totaling $142,500.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

216.   From March 10, 2023 through December 28, 2023, Safe Life Solutions LLC received $133,329.35 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any

legitimate investment activity. Defendant provided no reasonably equivalent value in exchange for these "false profits." *See id*.

217. Upon information and belief, Safe Life Solutions LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Robin L. Rowan.

218. The Receiver demands and seeks to avoid, recover, and disgorge from Robin L. Rowan and Safe Life Solutions LLC the net amount of $761,655.64 (representing the total Commissions and "false profits" received by the Defendant, less the amount of "investments") in Commissions Drive Planning paid to them.

### *Francisco Herrera and His Alter-Ego Confia Financial Group*

219. From September 23, 2022 through June 14, 2024, Drive Planning made 45 transfers of funds in the total amount of $878,821.57 to Defendant Confia Financial Group as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Confia Financial Group and Francisco Herrera, attached hereto as ***Exhibit M***.

220. Upon information and belief, Confia Financial Group subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Francisco Herrera.

221. From May 13, 2023 through December 18, 2023, Defendant Francisco Herrera, individually, and through his entity Confia Financial Corporation made 3

transfers totaling $133,380.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

222.   The Receiver demands and seeks to avoid, recover, and disgorge from Francisco Herrera and Confia Financial Group the net amount of $745,441.57 (representing the total Commissions received by this Defendant, less the amount of "investments") in Commissions Drive Planning paid to them.

### Terry Holman

223.   From May 20, 2022 through June 30, 2023, Drive Planning made 26 transfers of funds in the total amount of $677,711.63 to Defendant Terry Holman as Commission payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Terry Holman, attached hereto as ***Exhibit N***.

224.   The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Holman the $677,711.63 in Commissions Drive Planning paid to him.

### James Beattey and His Alter-Ego Velomon, LLC

225.   From February 24, 2023 through June 14, 2024, Drive Planning made 34 transfers of funds in the total amount of $687,465.48 to Defendant Velomon, LLC and on November 22, 2023, Drive Planning made one transfer to James Beattey in the total amount of $13,631.42 as payments for their role in expanding the Ponzi

scheme by securing additional funds from new "investors." *See* Summary of Commissions to Velomon, LLC and James Beattey, attached hereto as ***Exhibit O***.

226.   Upon information and belief, Velomon, LLC subsequently transferred the funds it received to its alter-ego, sole owner, and manager, James Beattey.

227.   From February 1, 2023 through January 23, 2024, Defendant James Beattey, individually, and through his entity Velomon, LLC made 5 transfers totaling $118,900.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

228.   On March 8, 2024, James Beattey received $54,923.00 in purported "profits" on the "investments", which were, in reality, payments funded by other "investors'" deposits and not the result of any legitimate investment activity. Defendant Beattey provided no reasonably equivalent value in exchange for these "false profits." *See id*.

229.   The Receiver demands and seeks to avoid, recover, and disgorge from James Beattey and Velomon, LLC the net amount of $637,119.90 (representing the total Commissions and "false profits" received by these Defendants, less the amount of "investments") in Commissions Drive Planning paid to them.

### *John Williamson*

230.   From April 7, 2023 through June 14, 2024, Drive Planning made 32 transfers of funds in the total amount of $756,022.60 to Defendant John Williamson

as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to John Williamson, attached hereto as ***Exhibit P***.

231.   On April 26, 2023 and April 25, 2024, John Williamson made 2 transfers totaling $171,567.22 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

232.   On March 13, 2023, John Williamson received $20,000 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. Defendant provided no reasonably equivalent value in exchange for these "false profits." *See id*.

233.   The Receiver demands and seeks to avoid, recover, and disgorge from Defendant Williamson the net amount of $604,860.67 (representing the total Commissions and "false profits" received by Defendant Williamson, less the amount of "investments") in Commissions Drive Planning paid to him.

### *Aimee Spencer*

234.   From February 24, 2023 through June 14, 2024, Drive Planning made 33 transfers of funds in the total amount of $584,516.44 to Defendant Aimee Spencer as Commission payments for her role in expanding the Ponzi scheme by securing

additional funds from new "investors." *See* Summary of Transfers to Aimee Spencer, attached hereto as ***Exhibit Q***.

235. The Receiver demands and seeks to avoid, recover, and disgorge from Aimee Spencer the $584,516.44 in Commissions Drive Planning paid to her.

### *Juliana Mejia and Her Alter-Ego FNJ Services, LLC*

236. From February 4, 2022 through June 14, 2024, Drive Planning made 49 transfers of funds in the total amount of $533,348.84 to Defendant FNJ Services, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to FNJ Services, LLC, attached hereto as ***Exhibit R***.

237. Upon information and belief, Defendant FNJ Services, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Juliana Mejia.

238. The Receiver demands and seeks to avoid, recover, and disgorge from Juliana Mejia and FNJ Services, LLC the $533,348.84 in Commissions Drive Planning paid to them.

### *William N. Holt and His Alter-Ego Summerfields Brands, LLC*

239. From July 28, 2023 through June 14, 2024, Drive Planning made 24 transfers of funds in the total amount of $434,147.13 to Defendant Summerfields Brands, LLC as payments for its role in expanding the Ponzi scheme by securing

additional funds from new "investors." *See* Summary of Commissions to Summerfields Brands, LLC, attached hereto as **Exhibit S**.

240.   Upon information and belief, Summerfields Brands, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, William N. Holt.

241.   From January 30, 2023 through March 1, 2023 , Defendant William N. Holt, individually, and through his entity Summerfields Brands, LLC made 5 transfers totaling $775,000. to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

242.   From July 26, 2023 through June 4, 2024, William N. Holt received $785,000.00 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. These Defendants provided no reasonably equivalent value in exchange for these "false profits." *See id*.

243.   The Receiver demands and seeks to avoid, recover, and disgorge from William N. Holt and Summerfields Brands, LLC the net amount of $444,147.13 (representing the total Commissions and "false profits" received by the Defendants, less the amount of "investments") in Commissions Drive Planning paid to them.

### Everett J. Stull

244.   From February 10, 2023 through June 14, 2024, Drive Planning made 36 transfers of funds in the total amount of $652,619.77 to Defendant Everett J. Stull II as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Everett J. Stull II, attached hereto as ***Exhibit T***.

245.   From February 6, 2023 through June 5, 2024, Defendant Everett J. Stull II, made 4 transfers totaling $233,000.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

246.   From May  8, 2023  to February 20, 2024, Everett J. Stull II received $15,997.20 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. Defendant provided no reasonably equivalent value in exchange for these false profits. *See id*.

247.   The Receiver demands and seeks to avoid, recover, and disgorge from Everett J. Stull II the $435,616.13 (representing the total Commissions and  "false profits," less the amount of "investments" in Commissions Drive Planning paid to him.

*Adam Israel*

248.   From June 30, 2023 through May 3, 2024, Drive Planning made 19 transfers of funds in the total amount of $421,461.84 to Defendant Adam Israel as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Adam Israel, attached hereto as *Exhibit U*.

249.   The Receiver demands and seeks to avoid, recover, and disgorge from Adam Israel the $421,461.84 in Commissions Drive Planning paid to him.

*Tara Mettler and Her Alter-Ego Position Yourself Wealth Strategies*

250.   From February 25, 2022 through June 30, 2023, Drive Planning made 34 transfers of funds in the total amount of $349,257.27 to Defendant Position Yourself Management, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Commissions to Position Yourself Management, LLC, attached hereto as *Exhibit V*.

251.   Upon information and belief, Position Yourself Management, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Tara Mettler.

252.   From August 16, 2022 through February 15, 2023, Tara Mettler made 3 transfers totaling $142,000.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

253.   From May 17, 2023 through August 17, 2023, Tara Mettler received $191,505.00 in purported "profits" on the Investments, which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. These Defendants provided no reasonably equivalent value in exchange for these "false profits." *See id*.

254.   The Receiver demands and seeks to avoid, recover, and disgorge from Tara Mettler and Position Yourself Management, LLC the net amount of $398,762.27 (representing the total Commissions and "false profits" received by these Defendants, less the amount of "investments") in Commissions Drive Planning paid to them.

### *Ramon Donato Palacio and His Alter-Ego Audicol Services, LLC*

255.   From August 12, 2022 through June 14, 2024, Drive Planning made 32 transfers of funds in the total amount of $345,330.07 to Defendant Audicol Services, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors."  *See* Summary of Commissions to Audicol Services, LLC, attached hereto as ***Exhibit W***.

256.   Upon information and belief, Audicol Services, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Ramon Donato Palacio.

257.   From July 14, 2021 through November 17, 2023, Ramon Donato Palacio made 4 transfers totaling $140,000.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

258.   From January 14, 2022 through April 18, 2024, Ramon Donato Palacio received $163,400.00 in purported "profits" on the Investments, which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. These Defendant provided no reasonably equivalent value in exchange for these "false profits." *See id*.

259.   The Receiver demands and seeks to avoid, recover, and disgorge from Ramon Donato Palacio and Audicol Services, LLC the net amount of $368,730.07 (representing the total Commissions and "false profits" received by the Defendants, less the amount of "investments") in Commissions Drive Planning paid to them.

### *Angela Ruff*

260.   From May 20, 2022 through June 30, 2023, Drive Planning made 31 transfers of funds in the total amount of $310,911.99 to Defendant Angela Ruff as Commission payments for her role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Angela Ruff, attached hereto as ***Exhibit X***.

261.   On August 19, 2022 and March 17, 2023, Angela Ruff, made 2 transfers totaling $80,000.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

262.   From April 1, 2022 through September 20, 2023, Angela Ruff received $130,364.00 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. Defendant Ruff provided no reasonably equivalent value in exchange for these "false profits." *See id*.

263.   The Receiver demands and seeks to avoid, recover, and disgorge the net amount of $361,275.99 (representing the total Commissions and "false profits," less the amount of  "investments") in Commissions Drive Planning paid to her.

### *Jeffrey Lawrence Black Jr.*

264.   From February 24, 2023 through June 14, 2024, Drive Planning made 35 transfers of funds in the total amount of $393,552.64 to Defendant Jeffrey Lawrence Black Jr. as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Jeffrey Lawrence Black Jr., attached hereto as ***Exhibit Y***.

265.   On March 20, 2024 and May 6, 2024, Defendant Jeffrey Lawrence Black Jr., made 2 transfers totaling $42,000.00 to Drive Planning for purported "investments" in its fraudulent scheme.  *See id*.

266.   The Receiver demands and seeks to avoid, recover, and disgorge from Jeffrey Lawrence Black Jr. the net amount of $351,552.64 (representing the total Commissions, less the amount of "investments") in Commissions Drive Planning paid to him.

### Douglas Eze and Alter-Ego Largo Financial Services LLC

267.   From March 25, 2022 through May 31, 2024, Drive Planning made 23 transfers of funds in the total amount of $671,145.90 to Largo Financial Services LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Largo Financial Services LLC, attached hereto as **Exhibit Z**.

268.   Upon information and belief, Largo Financial Services LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Douglas Eze.

269.   On July 27, 2022 through October 31, 2023, Defendant Douglas Eze, individually, and through his entity Largo Trust made 3 transfers totaling $350,000.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

270.   The Receiver demands and seeks to avoid, recover, and disgorge from Largo Financial Services LLC and Douglas Eze the net amount of $321,145.90

(representing the total Commissions, less the amount of "investments") in Commissions Drive Planning paid to them.

### Remy Cruzmel and Alter-Ego Bluegenie Solutions, LLC

271.  From October 20, 2023 through June 14, 2024, Drive Planning made 15 transfers of funds in the total amount of $339,572.29 to Defendant Bluegenie Solutions, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Bluegenie Solutions, LLC, attached hereto as ***Exhibit AA***.

272.  Upon information and belief, Bluegenie Solutions, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Remy Cruzmel.

273.  From March 27, 2023 through May 30, 2024, Remy Cruzmel, individually and through his entity Bluegenie Solutions, LLC made 7 transfers totaling $133,900.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

274.  From June 28, 2023 through December 13, 2023, Remy Cruzmel received $44,000.00 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity. This Defendant provided no reasonably equivalent value in exchange for these "false profits." *See id*.

275. The Receiver demands and seeks to avoid, recover, and disgorge from Remy Cruzmel and Bluegenie Solutions, LLC the net amount of $249,672.29 (representing the total Commissions and "false profits" received by these Defendants, less the amount of "investments") in Commissions Drive Planning paid to them.

### *Ricardo Aguirre and His Alter-Ego Banamerica Financial Group*

276. From April 1, 2022 through June 30, 2023, Drive Planning made 33 transfers of funds in the total amount of $311,081.13 to Defendant Banamerica Financial Group as Commission payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Banamerica Financial Group, attached hereto as ***Exhibit BB***.

277. Upon information and belief, Banamerica Financial Group subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Ricardo Aguirre.

278. On March 4, 2022 and November 28, 2022 Ricardo Aguirre made 2 transfers totaling $110,000.00 to Drive Planning for purported "investments" in its fraudulent scheme. *See id*.

279. On September 7, 2023 Ricardo Aguirre received $33,000.00 in purported "profits" on the "investments", which were, in reality, payments funded by other investors' deposits and not the result of any legitimate investment activity.

These Defendants provided no reasonably equivalent value in exchange for these "false profits." *See id.*

280.   The Receiver demands and seeks to avoid, recover, and disgorge from Ricardo Aguirre and Banamerica Financial Group the net amount of $234,081.13 (representing the total Commissions and "false profits" received by these Defendant, less the amount of "investments") in Commissions Drive Planning paid to them.

### *Michael Woodford and His Alter-Ego Woodford Consulting, LLC*

281.   From March 9, 2021 through February 25, 2022, Drive Planning made 6 transfers of funds in the total amount of $48,008.00 to Defendant Woodford Consulting, LLC as payments for its role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Woodford Consulting, LLC, attached hereto as ***Exhibit CC***.

282.   Upon information and belief, Woodford Consulting, LLC subsequently transferred all of the funds it received from Drive Planning to its alter-ego, sole owner, and manager, Michael Woodford.

283.   The Receiver demands and seeks to avoid, recover, and disgorge from Woodford Consulting, LLC and Michael Woodford the $48,008.00 in Commissions Drive Planning paid to them.

### *Michael Woodford*

284.   From May 15, 2020 through January 11, 2022, Drive Planning made 6 transfers of funds in the total amount of $20,600.00 (collectively, the "Transfers") to Defendant Michael Woodford as payments for his role in expanding the Ponzi scheme by securing additional funds from new "investors." *See* Summary of Commissions to Michael Woodford, attached hereto as ***Exhibit DD***.

285.   The Receiver demands and seeks to avoid, recover, and disgorge from Michael Woodford the $20,600.00 in Commissions Drive Planning paid to him.

## X.    CLAIMS FOR RELIEF

## COUNT 1—ACTUAL FRAUDULENT TRANSFER UNDER GUVTA

### *(Receiver v. Agents to Avoid and Recover Commissions)*

286.   The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 285 into Count 1.

287.   Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in violation of the federal securities laws and received the Commissions in return for those sales or that successful solicitation.

288.   Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

289.    Defendants had direct contact with the "investors" to whom they sold Drive Planning's investment products, including the "R.E.A.L. Opportunity."

290.    Defendants received Commissions largely from the sales of Drive Planning's investment products, including the "R.E.A.L. Opportunity, to their own family, friends, clients, followers, acquaintances, and contacts, such that the "investors" "investments" were caused by Defendants' solicitation.

291.    Defendants directly and actively participated in the solicitation from the "investors" with whom or which they interacted an immediate sale of Drive Planning's investment products, including the "R.E.A.L. Opportunity."

292.    The "investors" with whom or which Defendants interacted "invested" in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

293.    Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from "investors," because that was the purpose of the Commissions.

294.    Defendants, on behalf Drive Planning, furthered and perpetuated the Ponzi scheme by soliciting and securing "investors" for Drive Planning so that Drive Planning received new "investor" money that it could use to pay prior "investors" the alleged "returns" on their "investments."

295.   The Receiver, in Count 1, seeks to avoid and recover the Commissions Drive Planning paid to Defendants set forth in the Commission Schedules attached to this ancillary complaint as *Exhibits A to DD* pursuant to the actual fraud provision of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

296.   The Commission Schedules detail the date and amount of each of the Commission payments Drive Planning made to Defendants. *See* Exhibits A to DD.

297.   Drive Planning made the Commission transfers to Defendants in furtherance of the Ponzi scheme, not for value, and with the actual intent to hinder, delay, and defraud creditors, pursuant to O.C.G.A. § 18-2-74(a)(1).

298.   Because Drive Planning's payments of Commissions to Defendants were fraudulent transfers of funds made in furtherance of the Ponzi scheme, actual intent to defraud creditors is presumed in a Ponzi scheme under the "Ponzi Scheme Presumption," which the Receiver will establish through expert opinion testimony.

299.   It is not Defendants' state of mind and intent that is at issue when determining actual fraudulent intent but rather it is the intent of Drive Planning as the transferor that is operative for purposes of the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

300.   Burkhalter and Bradford asserted their Fifth Amendment privilege against self-incrimination as to practically every question the SEC asked about Drive Planning, and the Court may draw an adverse inference from that testimony, and

such testimony and that adverse inference would apply to any Defendant's attempt to challenge the Receiver's application of the "Ponzi Scheme Presumption" to the actual fraudulent transfer claims asserted under GUVTA in this Count 1.

301.    Drive Planning operated as a Ponzi scheme and, as such, was insolvent from 2020 to 2024 and the Commission transfers it made to Defendants occurred after Drive Planning had incurred obligations.

302.    Ponzi schemes are deemed insolvent because their operations involve a fraudulent enterprise that does not generate profit but instead solicits "investor" funds to repay older "investors" with newer "investors'" money and incurs liabilities that the enterprise cannot pay each time it accepts new "investor" funds.

303.    As a direct and proximate result of the Commission payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

304.    The Commission payments Drive Planning made to Defendants injured Drive Planning and the Receivership Estate by dissipating its assets.

305.    Defendants, as Agents, conducted no due diligence or inadequate due diligence, despite their duty to do so, before selling Drive Planning's Ponzi scheme products to the public and were paid the Commissions based upon this conduct.

306.    Defendants, as Agents, sold illegal, unregistered securities to the public and were paid the Commissions based upon this conduct.

307.   Defendants, as Agents, by selling Drive Planning's illegal, unregistered securities to the public endorsed, gave legitimacy to, and burnished the Drive Planning Ponzi scheme through the imprimatur of their support and sponsorship of Drive Planning and its Ponzi-scheme "investment" products, by, including, but not limited to, directly affiliating themselves with Drive Planning by among other things, appearing as a "Financial Consultant" on Drive Planning's website (www.driveplanning.com), utilizing an @driveplanning.com email address and account to communicate with Drive Planning personnel, themselves, the public (potential or existing "investors"), and representing to the public that Drive Planning's illegal and unregistered securities were prudent, safe, and sound investments when they were not.

308.   Defendants did not act in "good faith" when they sold Drive Planning's illegal and unregistered securities to the public for their own profit without having conducted the required due diligence and remained willfully ignorant to the several "red flags" that would have provided notice of Drive Planning's fraudulent purpose to a financial professional selling a security when measured on an objective basis.

309.   Those "red flags" included: (i) the 40% annualized return for a real estate bridge loan; (ii) the vague manner in which the "R.E.A.L. Opportunity" was described; (iii) the lack of any documentation supporting the claim that loans were collateralized; (iv) the lack of information concerning the purported real estate

developers to whom or which the "investors'" funds were being provided; (v) the lack of any insurance or other means to protect "investors" against losses given the absence of any documentation providing the "investors" with collateral; and (vi) the sophistication level of Burkhalter and Bradford and their lack of experience or references in the commercial real estate lending market.

310.   Defendants, as Agents, to establish good faith, were required, but failed, to take the steps a prudent financial professional would have taken when receiving financial remuneration for the sale of an investment product or referral of an offering company, such as investigating: (i) the financial, performance, and personnel and background of the offering company; (ii) the associated risk factors and costs surrounding the investment strategy or product needed to be disclosed and evaluated; knowing they should never rely solely on a sponsor's or issuer's word about an investment product.

311.   Defendants, to establish good faith, were required, but failed to, review available investment ratings from qualified rating services before selling or recommending Drive Planning's investment products, including the "R.E.A.L. Opportunity".

312.   Defendants, as Agents, to establish good faith, were required, but failed, to request and investigate audited financial statements from Drive Planning, as the

sponsor and issuer, as well as any other literature provided by the company discussing its sales history and the background of key employees.

313.   The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value from Defendants and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme.

314.   Defendants provided no value to Drive Planning by selling Drive Planning's illegal and unregistered securities to the public because those transactions constituted illegal transactions and Defendants cannot profit from illegal transactions under Georgia law. *See* O.C.G.A. § 13-8-1.

315.   Defendants provided no value to Drive Planning by soliciting and securing "investors" because each Commission paid was associated with Drive Planning's incurrence of a liability to a new or existing "investor" that it could not satisfy because it was not a legitimate enterprise but ran solely as a Ponzi scheme.

316.   Ponzi scheme "profits", which is what the Commissions constitute, are never received in exchange for value.

317.   No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (*i.e.*, selling unregistered securities in violation of federal law) were illegal.

318.   The Commission payments Drive Planning made to Defendants set forth on the Commission Schedules at ***Exhibits A-DD*** are avoidable and recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(1).

319.   The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

Based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals. Such individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with Drive Planning.  Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited "investors" and sold the Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions.  As such, like the

initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from the entity Defendants to the individual Defendants are avoidable and recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-78(b)(1)(B).

## COUNT 2—CONSTRUCTIVE
## FRAUDULENT TRANSFER UNDER GUVTA

### *(Receiver v. Agents to Avoid and Recover Commissions)*

320.  The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 285 into Count 2.

321.  Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in violation of the federal securities laws and received the Commissions in return for those sales, or successful solicitation.

322.  Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

323.  Defendants had direct contact with the "investors" to whom they sold Drive Planning's investment products, including the "R.E.A.L. Opportunity."

324.  Defendants received Commissions largely from the sales of Drive Planning's investment products, including the "R.E.A.L. Opportunity, to their own

family, friends, clients, followers, acquaintances, and contacts, such that the "investors" "investments" were caused by Defendants' solicitation.

325.    Defendants directly and actively participated in the solicitation from the "investors" with whom or which they interacted of an immediate sale of Drive Planning's investment products, including the "R.E.A.L. Opportunity."

326.    The "investors" with whom or which Defendants interacted "invested" in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

327.    Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from "investors," because that was the purpose of the Commissions.

328.    The Receiver, in Count 2, seeks to avoid and recover the Commissions Drive Planning paid to the Agents set forth in the Commission Schedules attached to this ancillary complaint as ***Exhibits A to DD*** pursuant to the constructive fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(2).

329.    The Commission Schedules detail the date and amount of each of the Commission payments Drive Planning made to Defendants.

330.    Drive Planning operated as a Ponzi scheme and was insolvent from during the relevant periods from 2020 to 2024 and the Commission transfers it made to Defendants occurred after Drive Planning had incurred obligations.

331.   The Receiver will prove Drive Planning's insolvency during the period of time when Drive Planning made the Commission payments through expert opinion testimony.

332.   Drive Planning made the Commission transfers to Defendants when it was insolvent. By making these payments, Drive Planning either intended to incur, or reasonably should have known that it would incur, debts beyond its ability to pay the debts as they become due, in violation of O.C.G.A. § 18-2-74(a)(2).

333.   Defendants did not provide Drive Planning with reasonably equivalent value in exchange for the Commission payments.

334.   As a direct and proximate result of the Commission payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

335.   Defendants, as Agents, conducted no due diligence or inadequate due diligence, despite their duty to do so, before selling Drive Planning's Ponzi scheme products to the public and were paid the Commissions based upon this conduct.

336.   Defendants, as Agents, sold illegal, unregistered securities to the public and were paid the Commissions based upon this conduct.

337.   Defendants, as Agents, by selling Drive Planning's illegal, unregistered securities to the public endorsed, gave legitimacy to, and burnished the Drive Planning Ponzi scheme through the imprimatur of their support and sponsorship of

Drive Planning and its Ponzi-scheme "investment" products, by, including, but not limited to, directly affiliating themselves with Drive Planning by among other things, appearing as a "Financial Consultant" on Drive Planning's website (www.driveplanning.com), utilizing an @driveplanning.com email address and account to communicate with Drive Planning personnel, themselves, the public (potential or existing "investors"), and representing to the public that Drive Planning's illegal and unregistered securities were prudent, safe, and sound investments when they were not.

338.   Defendants did not act in "good faith" when they sold Drive Planning's illegal and unregistered securities to the public for their own profit without having conducted the required due diligence and remained willfully ignorant to the several "red flags" that would have provided notice of Drive Planning's fraudulent purpose to a financial professional selling a security when measured on an objective basis.

339.   Those "red flags" included: (i) the 40% annualized return for a real estate bridge loan; (ii) the vague manner in which the "R.E.A.L. Opportunity" was described; (iii) the lack of any documentation supporting the claim that loans were collateralized; (iv) the lack of information concerning the purported real estate developers to whom or which the "investors" funds were being provided; (v) the lack of any insurance or other means to protect "investors" against losses given the absence of any documentation providing the "investors" with collateral; and (vi) the

sophistication level of Burkhalter and Bradford and their lack of experience or references in the commercial real estate lending market.

340.   Defendants, as Agents, to establish good faith, were required, but failed, to take the steps a prudent financial professional would have taken when receiving financial remuneration for the sale of an investment product or referral of an offering company, such as investigating: (i) the financial, performance, and personnel background of the offering company; (ii) the associated risk factors and costs surrounding the investment strategy or product needed to be disclosed and evaluated; knowing they should never rely solely on a sponsor's or issuer's word about an investment product.

341.   Defendants, to establish good faith, were required, but failed, to review available investment ratings from qualified rating services before selling or recommending Drive Planning's investment products, including the "R.E.A.L. Opportunity".

342.   Defendants, as Agents, to establish good faith, were required, but failed, to request and investigate audited financial statements from Drive Planning, as the sponsor and issuer, as well as any other literature provided by the company discussing its sales history and the background of key employees.

343.   Defendants provided no value to Drive Planning by selling Drive Planning's illegal and unregistered securities to the public because those transactions

constituted illegal transactions and the Agents cannot profit from illegal transactions under Georgia law. *See* O.C.G.A. § 13-8-1.

344.    The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme "profits", which is what the Commissions constitute, are never received in exchange for value.

345.    No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (i.e., selling unregistered securities in violation of federal law) were illegal.

346.    The Commission payments Drive Planning made to the Agents set forth on the Commission Schedules at ***Exhibits A to DD*** are avoidable and recoverable under the constructive fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-74(a)(2).

347.    The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

348.    Based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals. Such

individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with Drive Planning. Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited "investors" and sold the Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions. As such, like the initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from the entity Defendants to the individual Defendants are avoidable and recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-78(b)(1)(B).

### *ALTERNATIVE* COUNT 3—UNJUST ENRICHMENT UNDER GEORGIA COMMON LAW

### *(Receiver v. Agents to Disgorge Commissions)*

349.   The Receiver sues Defendants and adopts, realleges, and incorporates paragraphs 1 through 285 into Count 3.

350.   Defendants, as Agents, on behalf of Drive Planning, sold, or successfully solicited the purchase of, unregistered securities to the public in

violation of the federal securities laws and received the Commissions in return for those sales.

351.   Defendants sold, or successfully solicited the purchase of, Drive Planning's investment products, including the "R.E.A.L Opportunity" and were motivated at least in part by a desire to serve their own financial interests.

352.   Defendants had direct contact with the "investors" to whom they sold Drive Planning's investment products, including the "R.E.A.L. Opportunity."

353.   Defendants received Commissions largely from the sales of Drive Planning's investment productions, including the "R.E.A.L. Opportunity, to their own family, friends, clients, followers, acquaintances, and contracts, such that the "investors" "investments" were caused by Defendants' solicitation.

354.   Defendants directly and actively participated in the solicitation from the "investors" with whom or which they interacted of an immediate sale of Drive Planning's investment products, including the "R.E.A.L. Opportunity."

355.   The "investors" with whom or which Defendants interacted "invested" in, and therefore purchased, Drive Planning's investment products, including the R.E.A.L. Opportunity, as a result of Defendants' solicitation.

356.   Defendants received the Commissions from Drive Planning for their direct solicitation of and securing funds from "investors," that was the purpose of the Commissions.

357.   The Receiver, in Count 3, seeks to disgorge the Commissions Drive Planning paid to the Agents set forth in the Commission Schedules attached to this ancillary complaint as ***Exhibits A to DD*** pursuant to the Georgia common law claim of unjust enrichment.

358.   Drive Planning conferred a benefit upon Defendants in the form of the Commissions.

359.   Defendants received and accepted a benefit as a result of the wrongful payments made to them in the form of the Commissions.

360.   Drive Planning made the Commission transfers to Defendants from "investor" funds and not from Drive Planning's own funds, because it essentially had none.

361.   Defendants provided no compensation or benefit to Drive Planning for the receipt of the Commissions.

362.   Defendants should not be allowed to benefit from the fraudulent Commission payments merely because they, themselves, were not to blame for the fraud.

363.   Defendants do not have a legitimate claim to the funds they received in the form of the Commissions.

364.   Based upon these facts, it is unjust for Defendants to retain the pre-receivership "investor" derived money Drive Planning had paid to them.

365. The Commission payments were not made by Drive Planning to Defendants in exchange for anything of equivalent value and represented nothing more than redirected funds Drive Planning had obtained from new participants in the Drive Planning Ponzi scheme.

366. Ponzi scheme "profits", which is what the Commissions constitute, are never received in exchange for value.

367. No agreement between Drive Planning and Defendants under which Drive Planning paid the Commissions is enforceable because Defendants' activities (i.e., the unregistered sale of securities in violation of federal law) were illegal.

368. Defendants should not receive a disproportionate share of the recovered "investor" funds.

369. These wrongful Commission payments directly and proximately injured Drive Planning and the Receivership Estate.

370. As a direct and proximate result of payments made to Defendants, Drive Planning and the Receivership Estate suffered damages and have been rendered liable to investors, creditors, and other third parties.

371. In equity, Defendants cannot be allowed to keep the money they were paid for soliciting and securing "investors" to the Drive Planning Ponzi scheme, thereby causing those investors to lose all or substantially all of their money, or if

they are not in a net loss position, being subject to a lawsuit to recover the "false profits" they received by being part of a Ponzi scheme because of Defendants.

372.    The Receiver is entitled to disgorgement of the Commission payments under Georgia's common law claim of unjust enrichment.

373.    The Receiver is entitled to an award of prejudgment interest based upon the amounts demanded and owed, pursuant to O.C.G.A. § 51-12.4.

374.    Based upon information and belief, certain individual Defendants, who are the principals of entity Defendants, directed Drive Planning to pay the entity Defendants of which they are the principals, instead of them individually, even though such payments were for the benefit of the individual principals.  Such individual Defendants presumably did so to have the entity Defendants act as a shield to protect the individuals from any liability associated with their involvement with Drive Planning.  Those individual Defendants dominated and controlled their respective entity Defendants and caused such entities to transfer the Commission payments they received directly to or for the benefit of the individual principals, who then became subsequent transferees of the fraudulent transfers from Drive Planning. As it was the individual Defendants who actually solicited "investors" and sold the Drive Planning investment products in exchange for which their entities were paid Commissions, the individuals, like their entities, lacked good faith and did not provide value to Drive Planning in exchange for the Commissions.  As such, like the

initial transfers of the Commissions from Drive Planning to the entity Defendants, the subsequent transfers of the Commissions from the entity Defendants to the individual Defendants are avoidable and recoverable under the actual fraudulent transfer provisions of GUVTA. *See* O.C.G.A. § 18-2-78(b)(1)(B).

## PRAYER FOR RELIEF

WHEREFORE, Kenneth D. Murena, as Receiver, respectfully prays for entry of a judgment in his favor and against Defendants:

## I.

***On Count 1 of the Complaint***: avoiding and recovering the Commission transfers as actual fraudulent transfers under O.C.G.A. § 18-2-74(a)(1); determining that the entity Defendants were the alter egos of their individual principals rendering the individual principals liable or, alternatively, that the individual Defendants who received Commissions through entities were the either the true beneficiaries of the transfers or subsequent transferees of their entities, and entering money judgment against each of Defendants in the amount of the Commission transfers they each received;

## II.

***On Count 2 of the Complaint***: avoiding and recovering the Commission transfers as constructive fraudulent transfers under O.C.G.A. § 18-2-74(a)(2), determining that the entity Defendants were the alter egos of their individual

principals rendering the individual principals liable or, alternatively, that the individual Defendants who received Commissions through entities were either the true beneficiaries of the transfers or the subsequent transferees of their entities, and entering money judgment against each of Defendants in the amount of the Commission transfers they each received;

### III.

***On Count 3 of the Complaint***: disgorging the Commission transfers as inequitable unjust enrichment benefits, determining that the entity Defendants were the alter egos of their individual principals rendering the individual principals liable, and entering money judgments against each of Defendants in the amount of benefit they unjustly and inequitably received in the form of Commission transfers they each received;

### IV.

Awarding pre- and post-judgment interest on the money judgments entered against Defendants;

### V.

Reserving jurisdiction to impose constructive trusts on real or personal property of Defendants to which the received Commission transfers are traced under applicable federal and state law;

### VI.

Taxing costs against Defendants; and

## VII.

Awarding such other and further relief as the Court shall deem just and proper.

Dated: August 13, 2025.

*Henry F. Sewell*
Henry F. Sewell, Jr.
Georgia Bar No. 636265
Buckhead Centre
2964 Peachtree Road NW, Suite 555
Atlanta, GA 30305
Telephone: (404) 926-0053
hsewell@sewellfirm.com
*Local Counsel for Kenneth D. Murena,*
*As Court-Appointed Receiver*

Kristopher E. Pearson
*PHV Admission Forthcoming*
Florida Bar Number 16874
kpearson@dvcattorneys.com
Adriana Pavon
Admitted *Pro Hac Vice* in
Case No. 1:24-cv-03583-VWC
*PHV Admission Forthcoming*
In this ancillary action
Florida Bar Number 1025060
apavon@dvcattorneys.com
DAMIAN | VALORI | CULMO
1000 Brickell Avenue, Suite 1020
Miami, FL 33131
Telephone: (305) 371-3960

*Lead Counsel for Kenneth D. Murena,*
*as Court-Appointed Receiver*